2014 VT 37

# In re B.R., Juvenile

[97 A.3d 867]

No. 13-388

Present: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Davenport, Supr. J., Specially Assigned

Opinion Filed April 25, 2014

*Matthew F. Valerio*, Defender General, and *Marshall Pahl*, Appellate Defender, Montpelier, for Appellant.`

*William H. Sorrell*, Attorney General, *Robert F. McDougall* and *Bridget Asay*, Assistant Attorneys General, Montpelier, for Appellee State.

*Michael Rose*, St. Albans, for Appellee Juvenile.

¶ 1. **Dooley, J.** Father appeals from the trial court's order adjudicating B.R. a child in need of care or supervision (CHINS). He argues that the court's decision is not supported by the evidence. We affirm.

¶ 2. B.R. was born in November 2012. On Monday, March 4, 2013, the Department for Children and Families (DCF) filed a petition alleging that B.R. was CHINS, and it obtained an

emergency care order.[1] DCF's supporting affidavit included, among other things, mother's alleged acknowledgement of a long history of significant drug use including intravenous opiate use and cocaine use. The affidavit also recounted events that allegedly occurred shortly before the CHINS petition was filed, including the circumstances surrounding mother's Friday, March 1, 2013, arrest for driving under the influence of drugs with her two older children in the car; mother's statements to the arresting officers about being stopped the day before for possessing a methadone pill and crystal methamphetamine, drugs that she stated belonged to father; mother's admission to the arresting officers that she had cooked methamphetamine with father at the family's home the night before her DUI arrest; mother's concern at that time about B.R.'s welfare in father's care, and her fears that father had taken the three-month-old child to a "meth house" in New York; and mother's subsequent statements to police on Saturday, March 2, that she had retrieved B.R. from a "meth house" in New York where father had taken him.

¶ 3. Following a March 6, 2013 temporary care hearing, the court transferred temporary custody of B.R. to DCF based on the parties' stipulation and the affidavit referenced above. The court found that mother was addicted to drugs and unable to care for B.R., and that father might also be addicted and unable to care for B.R. B.R. was placed with his maternal great-grandmother. Father agreed to this plan.

¶ 4. At the September 2013 merits hearing, mother stipulated that she "was unable to adequately care for [B.R.] due to long-term substance abuse and her failure to access and engage in services" to address her drug use and its impact on B.R. The allegations in DCF's affidavit were reserved for the disposition hearing. Father did not stipulate that B.R. was CHINS, and the merits hearing went forward.

¶ 5. The State first sought to introduce testimony from the state trooper who had stopped mother for DUI, including statements that mother allegedly made to him about father's involvement in making methamphetamine at the family's home, and father taking B.R. to a meth house in New York where mother later retrieved him. The court excluded the trooper's testimony as inadmissible hearsay.

---

[1] Mother has two other children by different fathers; these children were also subject to the emergency care order.

¶ 6. Following a brief recess, the State indicated that it lacked the evidence to go forward. The court queried whether any additional evidence was necessary. It explained that mother, who was at least one and possibly the only custodial parent, had admitted that B.R. was CHINS, which would result in a disposition hearing no matter what. The court found nothing in the statute that required a finding against both parents individually before taking a child into custody and moving to disposition. It found that the allegations in the CHINS petition had clearly been established based on mother's admission, and given that B.R. had been living with mother.

¶ 7. A question then arose as to B.R.'s whereabouts on the day the CHINS petition was filed. After a discussion between the court and counsel, the court granted the State's request to reopen the evidence. The State then presented evidence from a DCF social worker who had been working with the family since July 2012. She testified that mother and father had been sharing an apartment in Swanton, Vermont, and that B.R. was living there as well.

¶ 8. The social worker went on to describe the creation of a safety plan in which B.R. was to live with mother's parents. She testified that the plan was put in place around the time that mother had retrieved B.R. from the alleged meth house in New York. The court overruled father's counsel's hearsay objection to this testimony, explaining that it was trying to determine when the safety plan was created. The witness then stated that mother had retrieved B.R. from father's care in New York, and, subsequent to that, the baby resided with mother's father and step-mother.

¶ 9. The social worker then provided additional testimony about parents' living situation. She explained that she met with parents shortly after the CHINS petition was filed and, at that point, they both stated to her that they were still residing together in the Swanton apartment. During that meeting, the social worker discussed parents' drug use, and parents admitted to prior and current substance-abuse issues. Father stated that he had been in inpatient substance-abuse treatment twice, that he had plans to go to the Brattleboro Retreat that week, and that he was currently using opiates and Suboxone off the street to prevent sickness.

¶ 10. On cross-examination, the social worker acknowledged that she had not visited the Swanton apartment between February 20

and March 4. She explained that, during that time, she had spoken with father and was focused on having him complete a substance-abuse assessment. The social worker also indicated that she had not made the safety plan, and that another DCF social worker told her where B.R. was during the weekend prior to the filing of the CHINS petition. Father's attorney then moved to strike the social worker's testimony concerning B.R.'s whereabouts between February 20 and March 4 on hearsay grounds. The court overruled the objection, noting that the testimony had come in previously without objection. The court went on to explain that the critical issue for the court was whether the social worker knew from her own visits that father and mother were living together. The social worker reiterated that that was the case.

¶ 11. At the close of the hearing, the court concluded that DCF had established the allegations in the CHINS petition. It explained that the issue before it was not whether mother was a CHINS mother or father was a CHINS father, but rather, whether B.R. was a child in need of care or supervision at the time of the hearing. It found that B.R. had been living with parents prior to the filing of the CHINS petition. One parent had admitted that the child was CHINS, and admitted specifically that she was unable to adequately care for B.R. due to long-term substance abuse and her failure to access and engage in services to address her drug use and its impact on B.R. While father had admitted to at least a history of drug problems and some sort of self-treatment, the court found it unnecessary to make a separate CHINS finding as to father. These types of. issues, the court explained, needed to be addressed at disposition. As to B.R., however, the court was very satisfied that he was at risk of being harmed in his living situation with parents. Father appealed from the court's order.

¶ 12. Father argues that there was insufficient evidence to establish that B.R. was CHINS. He maintains that the presence of one admitted drug-addicted parent in a household does not suffice, and that there was no other evidence to show that B.R. was without proper parental care necessary for his well-being or that his welfare was at risk. According to father, the court relied on a presumption in reaching its conclusion, and its decision is therefore constitutionally infirm.

¶ 13. ■ We reject these arguments. As the trial court recognized, the "focus of a CHINS proceeding is the welfare of the

child." *In re C.P.*, 2012 VT 100, ¶ 28, 193 Vt. 29, 71 A.3d 1142. The State must prove, and the court must determine, if the allegations in a CHINS petition have been established. 33 V.S.A. § 5315(a), (f), (g). The State's burden of proof is a preponderance of the evidence. *Id.* § 5315(a). This standard of proof balances the State's interest in "ensuring the safety and welfare of the child" with the parents' interest "in maintaining family integrity." *In re M.L.*, 2010 VT 5, ¶ 7, 187 Vt. 291, 993 A.2d 400 (quotation omitted). It is particularly appropriate because "parents' rights are at most temporarily curtailed in a CHINS proceeding." *Id.*

¶ 14. ■ ■ If the trial court finds that the allegations in the CHINS petition have been established, it must order DCF to prepare a disposition case plan and set the matter for a disposition hearing. *Id.* § 5315(g). It is at the disposition hearing where "the determination of parental unfitness, which triggers the transfer of custody away from the parents, must be made." *In re R.L.*, 148 Vt. 223, 227, 531 A.2d 909, 911 (1987). If the court determines that the allegations in a CHINS petition have *not* been established, it must dismiss the CHINS petition and vacate any temporary orders made in connection with the CHINS proceeding. 33 V.S.A. § 5315(f). As discussed below, the trial court here properly focused on B.R.'s welfare, rather than on the respective unfitness of each parent, and it did not err in adjudicating B.R. as CHINS.

¶ 15. ■ A child is CHINS when he or she "is without proper parental care or subsistence, education, medical, or other care necessary for his or her well-being." 33 V.S.A. § 5102(3)(B). This language must be liberally construed. See *In re N.H.*, 135 Vt. 230, 234, 373 A.2d 851, 855 (1977) ("[A] statute providing the basis for determining who are neglected children should be liberally construed so as to aid the purpose of its enactment."). We have expressly recognized that because a child's well-being is the central concern in a CHINS proceeding, "a court may adjudicate the child as CHINS even if the allegations are established as to one parent but not the other." *In re C.P.*, 2012 VT 100, ¶ 28.

¶ 16. In *In re N.H.*, for example, we upheld a CHINS finding where only one parent was culpable and the other was blameless. In that case, N.H. was abused while in her mother's care. The child's father was not living with the mother at the time, played no role in the abuse, and the State did not show that the father

was otherwise culpably disinterested in the child's welfare. We agreed with the trial court that the child was CHINS, despite the father's professed willingness and ability to parent her, and found that any other conclusion would frustrate the express statutory purpose of providing for the child's welfare. *In re N.H.*, 135 Vt. at 235, 373 A.2d at 855-56.

¶ 17. ■ The father in *In re N.H.* raised an argument similar to that presented here. Focusing on the word "parents" in the juvenile statutes, he maintained that N.H. could not be CHINS unless it was affirmatively shown that both parents were involved in the circumstances giving rise to the trial court's jurisdiction. In addressing this argument, we emphasized that the trial court had no power to proceed to disposition unless it first concluded that a child was CHINS. *Id.* at 235, 373 A.2d at 855. Absent such finding and the assumption of jurisdiction, there was "a strong possibility" that the child would "be returned to the same situation from which it has been taken." *Id.* Additionally, without a CHINS finding, there was "no assurance that the parent who ha[d] not participated in the abuse, and ha[d] avowed his desire to assume custody, [would] in fact receive custody." *Id.* We found nothing in the statutory language that would compel such an outcome. We thus concluded that the trial court was justified in assuming jurisdiction and upheld its determination that N.H. was an abused child without proper parental care and control.

¶ 18. In *In re F.P.*, 164 Vt. 117, 665 A.2d 597 (1995), we again upheld a CHINS adjudication where only one parent was the abuser and the other parent played no role in the abuse. In that case, the trial court dismissed the CHINS petition as to the children's mother, rejecting the State's contention that the mother had failed to protect the children. The court nonetheless retained jurisdiction to consider disposition given its conclusion that the children were CHINS due to the father's abuse and his failure to provide the children with proper parental care necessary for their well-being. Although the parents lived together, we agreed with the trial court that the children were without parental care necessary for their well-being.

¶ 19. ■ As in the instant case, the father in *In re F.P.* argued that the trial court was obligated to dismiss the CHINS petition once the State failed to prove its allegations against the mother. In other words, he asserted that the statute required the court to

find the children CHINS with regard to both parents before it could proceed to disposition. As previously noted, the juvenile statutes, both then and now, require the court to retain jurisdiction to consider disposition if it finds that the allegations in a CHINS petition are established, and conversely, to dismiss the petition if the allegations are not established. See *id.* at 120-21, 665 A.2d at 600; see also 33 V.S.A. § 5315(f), (g) (current statutory provisions so providing). Thus, the father essentially argued that if the allegations against one parent were not established, but the allegations against the other were, then the statutory language requiring dismissal trumped the provision requiring the court to proceed to disposition.

¶ 20. ■ We rejected this argument. In doing so, we considered our prior case law and looked to the purposes served by a CHINS proceeding. We explained that the father's construction of the law would require the trial court to dismiss a case and return a child to an abusive home merely because the State failed to establish the allegations against one of the parents. This construction, we concluded, was directly contrary to the protective nature of CHINS proceedings and it would serve only to further endanger a child. "Because the focus of a CHINS proceeding is on the child's welfare," we concluded, "the purpose of [the juvenile-protection law] is furthered where the court retains jurisdiction . . . if the allegations in the petition are established as to one parent and the court concludes the children are either abused or lack proper parental care necessary for their well-being." *In re F.P.*, 164 Vt. at 122, 665 A.2d at 601. Given our conclusion, we found it unnecessary to address the father's argument that the court violated a host of state and federal constitutional provisions by retaining jurisdiction to consider disposition when it was required to dismiss the case.

¶ 21. The dissent distinguishes *In re N.H.* because the parents in that case were living apart and the custodial parent was responsible for abuse of the child. *Post,* ¶ 31. Father distinguishes *In re F.P.* because, although father and mother resided together, the father in that case abused the child so dismissal of the petition would place the child right back in the home with the father. Here, father argues that although mother stipulated that she is unable to provide proper care to the child, there is no evidence, and therefore no finding, that father is unable to provide proper care.

¶ 22. Particularly with respect to *In re F.P.*, we conclude that the distinction does not represent a meaningful difference. Six children were involved in *In re F.P.* The trial court found that the father had abused one child and, as a result of the father's actions only, five children were without proper parental care necessary for their well-being. The trial court rejected the State's contention that the children were CHINS because mother failed to protect them. We held that the governing statute, 33 V.S.A. § 5526, authorized a finding of CHINS "when only one parent might be responsible for the children's lack of care" and concluded that the court has "jurisdiction under § 5526 if the allegations in the petition are established as to one parent and the court concludes the children are either abused or lack proper parental care necessary for their well-being." *In re F.P.*, 164 Vt. at 121-22, 665 A.2d at 600-01. Father here reads the holding to mean that the State must prove that the children "lack care necessary for their well-being" from either parent, but that conclusion is possible only if CHINS were found with respect to each parent, exactly what the trial court did not find in *In re F.P.* Moreover, that construction of *In re F.P.* would allow the children to be returned to the household and situation from which they were taken, a clearly unacceptable result.[2]

¶ 23. In this case, the evidence shows that B.R. was living with mother and father. Mother has admitted that she cannot adequately care for B.R. due to long-term substance abuse and her failure to access and engage in services to address her use and that her substance abuse had an impact on the children. Mother's admission establishes that B.R. was without proper parental care necessary for his well-being, as required by 33 V.S.A.

---

[2] The dissent, like father, does not persuasively distinguish *In re F.P.* from the instant case. The father in *F.P.* raised the same argument that the dissent embraces here. As set forth above, he asserted that the State must make its case against both parents before a child may be found to be CHINS. We rejected this argument in *In re F.P.* and do the same here. There was no showing in *In re F.P.* that the mother was incapable of providing the children with proper parental care necessary for their well-being, and we did not require the State to prove this point. So too in *In re N.H.* we concluded that the child was an abused child "without parental care and control" even though the child's father was available to parent the child. 135 Vt. at 232, 373 A.2d at 854. As in our prior cases, there was sufficient evidence here to show that B.R. was without proper parental care necessary for his well-being absent an inquiry into whether father had "assumed the full responsibilities of parenthood." *Post*, ¶ 46.

§ 5102(3)(B).[3] That admission is entirely inconsistent with father's position that mother's substance abuse had no adverse impact on the child because father can provide the necessary parental care. Moreover, father's legal argument would lead to the same result rejected by our prior decisions. It would allow a child to be returned to an unsafe home and possibly returned to the custody of the parent who has admitted his or her inability to care for that child. The law does not require such a result. Father's legitimate interests can be protected at disposition.

¶ 24. ■ In reaching this conclusion, we do not rule, as father has argued, that "presence of one parent with a substance abuse problem in a two-parent household necessarily places children in the household at risk." Father might have an argument that our cases use a de facto presumption if mother's admission contained no specification of what she was admitting. Here, the admission goes further and concedes that mother's substance abuse had an impact on the child. The admission was made in the context of stipulating to "the merits," that is, it was a concession by mother that her behavior, as recited, rendered the child without proper parental care necessary for his well-being. Because we do not accept that the court's decision rests on a presumption, we decline to reach father's constitutional arguments that such a presumption would be invalid. Cf. *Stanley v. Illinois*, 405 U.S. 645, 649 (1972) (holding that unwed father was entitled to hearing on his fitness as a parent before his children could be taken from him, and rejecting as "constitutionally repugnant" a state law that presumed unwed fathers to be unfit parents).

¶ 25. Father next argues that there was no admissible evidence to establish where B.R. was living during the time leading to the

---

[3] The question of the admissibility of mother's stipulation did not come up below, in large part because the court did not consider it to be evidence and father did not challenge the court's use of the stipulation. The dissent argues that the stipulation is inadmissible evidence that cannot be used against father, a position that appears to be inconsistent with its argument that there is no such thing as a CHINS as to father or as to mother. In any event, the dissent raises this issue sua sponte, without the benefit of briefing or a trial court ruling on this issue. See *post*, ¶¶ 40-41. We do not reach this issue because it is not properly before us. See, e.g., *State v. Taylor*, 145 Vt. 437, 439, 491 A.2d 1034, 1035 (1985) ("It is only in the rare and extraordinary case that this Court will consider, sua sponte, issues not properly raised on appeal before us."); *State v. Settle*, 141 Vt. 58, 61, 442 A.2d 1314, 1315 (1982) ("We have held, and we reiterate here that, in all but a few exceptional instances, matters which are not briefed will not be considered on appeal.").

CHINS petition. We disagree. The social worker testified that she had been working with the family since July 2012. She stated that she knew from her conversations with parents, and from conducting home visits, that the family, including B.R., was living together in an apartment in Swanton. When she visited parents shortly after the CHINS petition was filed, parents stated to her that they were "still" residing in the Swanton apartment. All of this testimony was admissible.

¶ 26. ■ The fact that the social worker did not visit the home between February 20 and March 4 does not render her testimony inadmissible, as father suggests. Certainly, it was reasonable under these circumstances both for the social worker, and the court, to conclude that B.R. was living, and continued to live, with parents in the same household until around the time that the CHINS petition was filed. See *In re L.M.*, 2014 VT 17, ¶ 30, 195 Vt. 637, 93 A.3d 553 (recognizing that in conducting its analysis, trial court may "draw upon its own common sense and experience" (quotation omitted)); see also *State v. Kerr*, 143 Vt. 597, 603, 470 A.2d 670, 673 (1983) ("[P]roof of facts includes reasonable inferences properly drawn therefrom."). B.R.'s precise location just prior to the CHINS filing is of no moment. See *In re L.M.*, 2014 VT 17, ¶ 20 (explaining that court is not limited to considering child's well-being on precise day CHINS petition is filed, and that, "[o]bviously, the circumstances leading up to the filing of the CHINS petition are relevant").

¶ 27. ■ Finally, father argues that if this Court upholds the CHINS adjudication without requiring a showing that B.R. was "without proper parental care," then the trial court must issue a disposition order discharging custody of B.R. to father. In support of this argument, father relies on language in *In re N.H.* that concerns the trial court's disposition order, not its CHINS finding. We reject the premise of father's argument, and note that the procedure advanced by father is wholly at odds with the statutory scheme created by the Legislature. The trial court here properly determined, based on the evidence, that B.R. was CHINS, and thus, by statute, it was obligated to proceed to disposition. The focus of the CHINS proceeding was on B.R.'s welfare; the question of father's fitness to parent B.R. will be addressed at

disposition.[4] We find no grounds to disturb the trial court's decision.

*Affirmed.*

¶ 28. **Robinson, J.**, dissenting. I am very concerned that in the course of affirming a CHINS finding that may well be warranted on the facts, if not on the evidentiary record, the majority has made a significant shift in the law governing these challenging and often tragic cases implicating the rights and well-being of children and their parents, thereby dramatically reducing the State's evidentiary burden in these cases.

¶ 29. The trial court was right to reject a framework in which a child has a "CHINS mother" or a "CHINS father." A CHINS finding focuses only on the child, and it reflects a determination, on the basis of the competent evidence in the record, that a child is in need of care and supervision. 33 V.S.A. § 5315(a). That is why a CHINS proceeding is captioned as an "In re" proceeding, rather than a "State v. Parent" proceeding. Although custodial parents are entitled to be heard as parties in a CHINS case, a court does not make a CHINS determination "against" or "as to" one parent or another. Rather, a CHINS finding reflects that a *child* has been abandoned or abused by the child's parent, guardian or custodian; is without proper parental care or subsistence, education, medical or other care necessary for his or her well-being; is without or beyond the control of his or her parent, guardian or custodian; or is habitually and without justification truant from compulsory school attendance. 33 V.S.A. § 5102(3). Even though both custodial parents are entitled to participate in the CHINS proceeding as parties, none of these findings necessarily implicates the conduct of *both* of a child's parents.[5] Given this legal framework, it is not at all surprising that there are cases in which a CHINS finding stands even in the absence of evidence that one

---

[4] In fact, the case has moved to disposition with the State seeking termination of father's parental rights and father seeking greater time with the child. Mother stipulated to termination of her parental rights. The court denied termination of father's parental rights as premature finding that father was making slow progress in his ability to parent the child. See *In re B.R.*, No. 52-3-13 Frjv (Vt. Super. Ct. Apr. 7, 2014).

[5] I need not and do not address the status of noncustodial parents. In this case, the trial court expressly found that the child was living with both parents in the run-up to the CHINS petition.

of the child's parents has done anything wrong. The most obvious example is a situation in which a custodial parent has abused a child, while the noncustodial parent played no role in the abuse. See *In re N.H.*, 135 Vt. 230, 235, 373 A.2d 851, 855-56 (1977) (concluding court's assertion of jurisdiction and finding that child was abused was warranted where child was undisputedly abused and neglected in mother's household, notwithstanding lack of culpable conduct by noncustodial father). Since this Court's decision in *In re N.H.*, the Legislature has amended the statute defining CHINS in a way that makes it clear that the fact of abuse by *a* parent, guardian or custodian is sufficient to support a CHINS finding. 33 V.S.A. § 5102(3)(A). That makes sense; a child who has been abused by a parent is a child in need of care or supervision, even if the child has another parent who had no knowledge or complicity in the abuse.

¶ 30. The same is true even if the noncomplicit parent is a custodial parent. In *In re F.P.*, this Court considered allegations that a father, who was the children's primary caregiver, engaged in excessive corporal punishment, touched his oldest daughter's breasts inappropriately, and masturbated in front of her. 164 Vt. 117, 119, 665 A.2d 597, 599 (1995). Father argued that because the State had dismissed claims of wrongdoing against mother, it could not proceed to disposition on the basis of a CHINS finding as a result of father's conduct. This Court rejected that claim, and explained, "if the allegations in the petition are established as to one parent and the court concludes that the children are either abused or lack proper parental care necessary for their well-being," a CHINS finding and disposition hearing is appropriate. *Id.* at 122, 665 A.2d at 601. Again, we emphasized that the focus is not the culpability or conduct of one parent versus the other; it is whether the child is abused or lacks proper parental care.

¶ 31. For this reason, even in the context of cases of neglect — as opposed to outright abuse — in which the CHINS finding rests on a determination that a child "is without proper parental care or subsistence, education, medical or other care necessary for his or her well-being," a court is not required in every case to evaluate the conduct of both of a child's parents. It is not at all uncommon for a court to make a CHINS finding on the basis that the custodial parent is not providing proper parental care, even if a noncustodial parent might have the ability to assume custody and provide appropriate care. See *In re N.H.*, 135 Vt. at 235, 373

A.2d at 856 (affirming trial court's finding that the child was "an abused child without proper parental care and control" notwithstanding availability of noncustodial parent who was not complicit in the abuse). This makes sense. If a child is relying on a custodial parent for parental care, and that parent is not providing it, the child is at that time in need of care or supervision, even if prospectively — e.g., at disposition — the other parent may be in a position to step in and provide the necessary care.

¶ 32. On the other hand, a child who lives with a responsible and capable parent who is meeting the child's needs is not a CHINS just because a noncustodial, nonabusive parent who is not caring for the child is incapable of meeting the child's needs. The fact that the noncustodial parent is incapable of providing the child with proper parental care is of no consequence if the child is living with and cared for by a custodial parent who is fully meeting the child's needs and promoting the child's well-being. I cannot cite a case to support this proposition because such cases do not exist; the State does not initiate CHINS cases based on inadequate parental care by a noncustodial parent when a child is living with a parent who is providing responsible care that meets the child's needs and promotes the child's well-being.

¶ 33. That brings us to this case. The question is: if that same incapable but nonabusive noncustodial parent moves in with the capable, responsible parent and the child, rather than living separately, does the child automatically become CHINS without regard to whether the capable parent continues to singlehandedly effectively meet the child's needs? Despite all of the inadmissible testimony impugning father that is recounted in the majority opinion,[6] that is what this case boils down to. The question presented is whether a child who lives with two parents is necessarily CHINS because one of those parents admits to a drug problem and agrees that she is incapable of caring for the child, without regard to whether that parent is actually caring for the child, and without regard to what the second parent in that two-parent home is doing to provide parental care. The trial court explained its ruling as follows:

---

[6] In setting the factual table in this sufficiency of evidence case, the majority opinion takes the unusual step of drawing extensively from allegations in DCF's CHINS petition that were not admitted into evidence in the merits hearing, and of recounting proffered testimony that was excluded on the basis of the Rules of Evidence.

In this case, one parent has admitted to merits, and she admitted to the following: That the mother was unable to adequately care for her children due to long-term substance abuse and her failure to access and engage in . . . services to address her use and its impact on the children . . . and there has been evidence to establish that the child and the parents lived together before and after the filing of the affidavit. So I'm satisfied that [B.R.], the [six-month-old] boy, was a child in need of care and supervision.

¶ 34. The trial court then went on to describe mother's admission of serious drug problems in conversations with the social worker, and father's admission to that social worker of "at least a history of drug problems and some sort of self-treatment through Buprenorphine." The court concluded, "the presence of one admitted and addicted parent in the household, I think, qualifies the child as a . . . child in need of care·and supervision."

¶ 35. There are three ways to interpret the basis for the trial court's CHINS determination. First, the ruling could rest on the presumption that one drug addicted parent in the household is sufficient to render the child CHINS, with no further evidence. Such a presumption is way overbroad and cannot substitute for actual evidence that, for example, as a result of that parent's addiction, the child's needs are not being met, or that, for example, the other parent is likewise unable or unwilling to effectively parent the child. See *In re L.M.*, 2014 VT 17, ¶ 39, 195 Vt. 637, 93 A.3d 553 (Robinson, J., dissenting) ("[I]f the State is to take the awesome step of interposing itself into the parent-child relationship, it cannot rely on broad generalizations or per se rules; it must have some individualized evidence that a child is without proper parental care necessary for the child's well-being."). The kind of blanket presumption articulated by the trial court could warrant State intervention with respect to countless children who are not lacking for proper parental care but have an alcoholic or drug-addicted parent, raising a host of constitutional issues, and deterring parents with addiction problems from seeking treatment.

¶ 36. This presumption is not the basis for the majority's affirmance, as the majority expressly rejects the suggestion that the trial court's judgment rests on a presumption that the presence of one parent with a substance abuse problem in a

two-parent household necessarily places the children at risk. *Ante*, ¶ 24. The majority's conclusion in this regard is puzzling, as the trial court itself articulated just that blanket presumption. But its decision not to embrace that presumption in affirming the trial court's decision is well founded.

¶ 37. Second, the trial court could be saying that, as a matter of law, because mother stipulated "to merits," as opposed to the specific facts to which she stipulated, a CHINS determination is warranted notwithstanding that father has not stipulated to CHINS.[7] Although it does not clearly hold that one custodial parent's stipulation to a CHINS finding can relieve the State of its burden of proof in a CHINS case even where another custodial parent contests the CHINS petition, the majority opinion suggests that this may be the case. See *ante*, ¶ 24. If this is the majority's holding, the majority misapprehends the legal effect of mother's stipulation to merits in the context of father's ongoing opposition to the State's petition. A CHINS determination must be supported by adequate findings on the record. 33 V.S.A. § 5315(e); *In re M.C.P.*, 153 Vt. 275, 291, 571 A.2d 627, 636 (1989) ("We require that both merits and disposition orders be accompanied by findings of fact which are sufficient to support the court's conclusion that the child is in need of care or supervision or its disposition order."). The statute governing CHINS merits hearings provides, that "[t]he *parties*," in the plural, "may stipulate to the merits of the petition. Such stipulation shall include a stipulation as to the facts that support a finding that the child is in need of care and supervision." 33 V.S.A. § 5315(b). To "stipulate to CHINS" is to waive the right to put the State to its proof on the subject, and to agree to the foundational facts for a CHINS determination. Mother in this case agreed to waive her right. Father, also a custodial parent, did not. That makes this a contested CHINS case. It is inaccurate to say that the State has established CHINS "against mother." Mother may acquiesce in

---

[7] Further support for this understanding of the trial court's determination can be found in the exchanges between the court and counsel during the course of the merits hearing. The trial court queried, "[W]here does the statute say that we have to find merits against both parents in order to have the child in custody and move to disposition?" On the other hand, if the stipulation to merits by one party were really sufficient to support a CHINS determination notwithstanding the presence of a second, nonstipulating custodial parent, the court would have ended the proceedings after mother's stipulation.

the State's petition, but as long as custodial father is challenging the petition, the State has to prove that this child is a CHINS. Mother has no legal authority to commit father to waiving the statutory requirement that the State prove through competent evidence that the child is a CHINS. See *Kneeland v. Luce*, 141 U.S. 437, 440 (1891) (stating stipulation is binding only upon parties to the record who in fact assented to it); *Arnett v. Throop*, 272 P.2d 308, 310 (Idaho 1954) (noting stipulation does not bind or affect those who were not parties to it). The fact of mother's stipulation would relieve the State of its obligation in a case in which mother was the *only* party, but in the face of a challenge by a custodial father, the State must prove its case, even if mother had been willing to accept a CHINS finding without an evidentiary hearing. To suggest otherwise would raise serious constitutional issues, and would distort the well understood meaning of "stipulation." The notion that mother, as a distinct party from father, can waive father's statutory right to put the State to its proof that their child is in need of parental care and supervision, and the constitutional liberty interest underlying that statutory right, would turn the CHINS statute and the constitution on its ear. See *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (acknowledging right to establish home and bring up children is among liberty interests protected by due process clause).

¶ 38. Moreover, mother's stipulation "to merits" does not itself provide the required factual support for the legal conclusion that the child is lacking parental care and supervision. 33 V.S.A. § 5315(e); *In re M.C.P.*, 153 Vt. at 291, 571 A.2d at 636.

¶ 39. Finally, the trial court's ruling could rest on the conclusion that between the admissible testimony introduced in the hearing and mother's stipulation that she was unable to adequately care for her children, the trial court had sufficient evidence to support a CHINS finding. This appears to be the primary basis underlying the majority's affirmance of the trial court's decision, although its reference to the significance of mother's stipulation "to merits" creates some ambiguity on this point. See *ante*, ¶ 24. There are two main problems with this approach.

¶ 40. As a threshold matter, mother's "admission" took the form of a stipulation rather than testimony under oath and subject to cross-examination. In a colloquy with mother, the court read the statement to mother and she answered "yes" when the court asked her if she was content to admit to the CHINS complaint.

Mother's "admission" was actually a stipulation that father did not join. It was not testimony. Father could not cross-examine her. To the extent that the statement mother affirmed in the courtroom was an out-of-court statement by her, it was not admissible as evidence against father pursuant to any hearsay exception. See *In re L.M.*, 2014 VT 17, ¶¶ 16-17 (concluding mother's out-of-court statements were inadmissible hearsay and should not have been used against father in making CHINS determination). For these reasons, I have serious doubts as to whether the facts reflected in mother's stipulation can be relied upon to support findings in the context of a CHINS proceeding in which custodial father challenges the petition.[8]

¶ 41. More importantly, even assuming that mother's stipulation to the factual finding reflected in the record can be treated as admissible evidence, it is insufficient to support a CHINS determination in this case. The court expressly found that the child lived with both mother and father at the time of the CHINS petition. Assuming that the trial court could properly conclude on the basis of mother's stipulation that the State had established that mother was unable to adequately care for the child, that finding alone would not support a CHINS determination in the context of the two-parent household at issue in this case. The trial court did not make any findings that the child was left in mother's care, or that the child's needs were not being met in their two-parent home. Nor could it have; nobody offered any admissible testimony to support either of these propositions. Although we are led by the inadmissible proffered testimony and allegations in DCF's petition to believe otherwise, father in this case could be the picture of responsibility — capably caring for the child day in and day out, meeting all of the child's material, emotional and developmental needs, except when he leaves the child with responsible caregivers so he can earn a wage to feed his family. Even so, the implication of the trial court's decision is that on the basis of mother's inability to herself care for the child, the child is CHINS.

---

[8] Although it does not make sense to speak of a CHINS finding "against mother" or "against father," it is entirely appropriate to recognize that mother and father are independent parties in a CHINS case, and the implications of the rules of evidence with respect to a particular item of testimony may be different as between them. There is nothing, as the majority suggests, inconsistent about this approach; it is what the law requires. See *ante*, ¶ 23 n.3.

¶ 42. In reaching this conclusion, the trial court made the leap from (1) *mother* admits that she is unable to adequately care for her child to (2) the child is not *getting* "proper parental care or subsistence, education, medical, or other care necessary for [the child's] well-being," 33 V.S.A. § 5102(3)(B), without any further examination of father's fitness or caregiving. In fact, the trial court concluded, "I'm not going to make a separate CHINS finding as to the father. We don't know too much, at this point, about him. As to [B.R.], the baby, I'm quite satisfied that he was at risk of being harmed in that setting." Having correctly acknowledged that there is no such thing as a "CHINS mother" or a "CHINS father," it is not entirely clear what the trial court meant when it declined to make a CHINS finding "as to father," but I infer that the court concluded that it was not necessary to determine whether father had himself engaged in neglectful or abusive behavior because mother's admission alone was sufficient to support a determination that the child was a CHINS.

¶ 43. This turns the framework of child-focused CHINS determinations on its ear. Just as the fact that one parent in a two-parent household is neither culpable nor complicit does not *preclude* a court from making a CHINS finding if the other parent has abused the child or has acted in a way that left the child without proper parental care, the fact that one parent in a two-parent home is incapable of caring for the child does not alone *support* a CHINS finding if the child is not, in fact, wanting for parental care thanks to the other parent's efforts. To the extent that the trial court's ruling rests on the notion that if mother is incapable of caring for the child, the child is CHINS, even if father lives with mother and child and provides proper parental care, the ruling cannot be right. Such an approach shifts the framework away from the question of whether the child is receiving proper parental care to the question of whether one parent or the other is providing such care. And it allows the State to intervene in the parent-child relationship without evidence that the child is actually CHINS as defined by statute. 33 V.S.A. § 5102(3)(B); see *In re N.H.*, 135 Vt. at 235, 373 A.2d at 855 ("[A]ny time the State seeks to interfere with the rights of parents on the generalized assumption that the children are in need of care and supervision, it must first produce sufficient evidence to demonstrate that the statutory directives allowing such intervention are fully satisfied.").

¶ 44. The majority leans heavily on the fact that mother's admission "concedes that mother's substance abuse had an impact on the child." *Ante*, ¶ 24. Mother conceded only that she was "unable to adequately care for her children due to long term substance abuse and her failure to access and engage in . . . services to address her use and its impact on the children." Because she referenced her failure to engage in services to address her use "and its impact on the children," the majority infers that mother concedes not only that her drug abuse had an impact on her children, but that the impact was sufficiently serious and adverse as to leave the child without proper parental care or subsistence, education, medical or other care necessary for his well-being. This inference may well be true, but there is nothing in the evidence that points us to that conclusion. It is nothing more than an assumption embraced to fill the gap between DCF's allegations and the actual evidence the State presented at the merits hearing.

¶ 45. By treating mother's stipulation as testimony admissible against father, I fear the majority has created new and ill-advised law pursuant to which either of two custodial parents, for any reason, can deprive the other of the constitutional right to put the State to its evidence in a CHINS case simply by "stipulating" — as opposed to testifying under oath and subject to cross-examination — to the CHINS determination itself, as well as to any alleged predicate facts. The statute does not contemplate that result, and I do not believe the U.S. Constitution countenances it. See, e.g., *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (" 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' " (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944))).

¶ 46. More important, in this case, the predicate facts to which mother stipulated were simply insufficient to support a CHINS order. By suggesting that mother's reference to the impact of her drug addiction on her child is sufficient to support a conclusion that the child is CHINS without any consideration of whether father has assumed the full responsibilities of parenthood and is effectively meeting the child's needs for parental care, the majority lowers the evidentiary bar to establishing CHINS to the ground. We have long recognized that "the freedom of children

and parents to relate to one another in the context of the family, free of governmental interference, is a basic liberty long established in our constitutional law." *In re N.H.*, 135 Vt. at 236, 373 A.2d at 856 (citing *Meyer*, 262 U.S. at 399). As a consequence, the State's authority to interfere with the parent-child relationship in the name of protecting children is "awesome," and is accordingly subject to statutory and constitutional restraints. *Id.* at 235-37, 373 A.2d at 855-57. Perhaps the most significant requirement at this stage of a proceeding is that the State present sufficient competent evidence to support a finding that a child is a CHINS, as that term is defined by statute. 33 V.S.A. §§ 5102(3), 5315. By affirming a CHINS determination on this record, I believe the majority fails to recognize the awesome nature of the power the State is asserting here, and the attendant restraints on that power.[9]

¶ 47. I emphasize that I am not setting an unduly high bar for the State here. The majority has recited extensive inadmissible testimony from a social worker about things mother said about father. Much of the testimony, inadmissible against father, would be admissible if offered through mother herself, rather than a third party repeating mother's alleged statements. Mother was in the courtroom on the morning of the merits hearing. If mother had herself testified to even one of the scandalous claims about father's behavior relayed secondhand and inadmissibly by the social worker or the state trooper, I have no doubt that a CHINS determination would have been warranted. But mother did not testify. Indeed, the State itself recognized the thinness of its case when it indicated to the court that it lacked the evidence to go forward once the court sustained father's objection to the trooper's hearsay testimony.

---

[9] To the extent that the majority is suggesting that mother's stipulation "to merits" is tantamount to testimony upon which the court can rely to conclude that the child is in need of parental care and supervision, the majority effectively treats mother's stipulation relieving the State of its burden of proof as binding on father — an approach at odds with the statute and well established constitutional protections for the reasons discussed above. Moreover, whether a child is in need of parental care and supervision is a *legal conclusion* gleaned from the predicate facts, not a factual finding. The conclusion must be supported by factual findings. 33 V.S.A. § 5315(e); *In re M.C.P.*, 153 Vt. at 291, 571 A.2d at 636. To the extent that the majority suggests that mother's stipulation as to the legal conclusion that the child is CHINS supports an inference that the underlying facts are established, it renders the clear statutory requirement of factual findings supporting a CHINS stipulation a nullity.

¶ 48. Nor am I suggesting that the State should return the child to father in the face of evidence that the child faces danger at home with mother and father. I *am* suggesting instead that if the State is going to take the serious step of intervening in the parent-child relationship, it needs to *provide* that evidence, and not just innuendo, to support its actions. Subpoena mother. Subpoena father. If either or both invokes the right to self-incrimination, talk to their family and friends and subpoena a witness who can transform even one of the allegations on the table into actual evidence.

¶ 49. In the face of claims, albeit inadmissible ones, that father took the infant to a "meth house," what court would want to deny a CHINS petition? But, as the trial court recognized, the rules of evidence apply in CHINS cases. 33 V.S.A. § 5315(d). The serious constitutional concerns implicated by the State's intervention, as well as the fact that children are not necessarily well served by State intervention in the absence of evidence warranting that intervention, call for strict adherence to the rules of evidence and the State's statutory proof requirements — not a well-intentioned departure from those limitations on the State's power. Because of the unquestioned urgency of protecting children from abuse and neglect, it is vital that the State do the work of putting together a sufficient case to support its intervention. This child, and other Vermont children, deserve no less.